IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

_____
A. O. D.[1]                         )
                                    )
    Plaintiff,                      )
                                    )
    v.                              )    Civil Action No. WGC-09-2757
                                    )
MICHAEL ASTRUE, Commissioner        )
Social Security Administration      )
_____ )

## MEMORANDUM OPINION

Plaintiff A.O.D. ("Plaintiff") brought this action pursuant to 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her claim for Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381-1383c. The parties consented to a referral to a United States Magistrate Judge for all proceedings and final disposition. *See* Document Nos. 3, 7-8.[2] Pending and ready for resolution are Plaintiff's Motion for Summary Judgment or, in the Alternative, Motion for Remand (Document No. 15) and Defendant's Motion for Summary Judgment (Document No. 24). No hearing is deemed necessary, s*ee* Local Rule 105.6 (D. Md. 2010), and thus Plaintiff's Motion for Hearing (Document No. 15) is **DENIED**. For the reasons set forth below, Plaintiff's Alternative Motion for Remand will be granted and Defendant's Motion for Summary Judgment will be denied.

---

[1] This claimant is not a minor. Due to the possibility that the electronic legal databases (*Lexis* and *Westlaw*) may post this opinion on their databases, the Court declines to disclose her name, in the interest of protecting the Plaintiff's privacy, and therefore identifies her by her initials.

[2] This case was subsequently reassigned to the undersigned.

1

1. **Background**.

On September 9,[3] 2004 Plaintiff protectively filed an application for SSI alleging a disability onset date of May 25, 2004. R. at 65-69. On the *Disability Report – Adult – Form SSA-3368* Plaintiff declared that (a) HIV positive beginning stages, (b) high blood pressure, (c) asthma, (d) diabetes, (e) glaucoma in right eye, (f) migraines and (g) back problems limit her ability to work. R. at 155. Her application was denied initially on February 23, 2005. R. at 48-50. On or about March 1, 2005 the Social Security Administration received Plaintiff's request for reconsideration. R. at 45-47. On May 19, 2005 the application was denied again. R. at 43-44. Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). R. at 41-42. On May 22, 2007 an ALJ convened a hearing. R. at 711-45. During the hearing the ALJ obtained testimony from Plaintiff and a vocational expert ("VE"). At the conclusion of this hearing the ALJ stated,

> I'm going to schedule two consultative evaluations, one a psychological evaluation, and ask the doctor to give me an opinion as far as what mental limitations the claimant might have, and also a general physical examination including pulmonary function studies and see what they show.

R. at 744.

The general physical examination occurred on or about June 26, 2007. *See* R. at 616-26. The psychological evaluation occurred on July 11, 2007. *See* R. at 602-15. In the January 31, 2008 decision the ALJ found Plaintiff was not disabled within the meaning of the Act. R. at 28.

On March 28, 2008 the Social Security Administration received Plaintiff's request for review of hearing decision/order. R. at 10. On September 16, 2009 the Appeals Council, finding no reason under the rules to review the ALJ's decision, denied Plaintiff's request for review, R. at 5-7, thus making the ALJ's determination the Commissioner's final decision.

---

[3] In his decision the ALJ states Plaintiff protectively filed her SSI application on September **7**, 2004. *See* R. at 14. The Court notes the application is dated September **9**, 2004 in the top right hand corner of the first four pages of the application. *See* R. at 65-68.

2. **ALJ's Decision**.

The ALJ evaluated Plaintiff's claim for SSI using the sequential evaluation process set forth in 20 C.F.R. § 416.920. Plaintiff bears the burden of demonstrating her disability as to the first four steps. At step five the burden shifts to the Commissioner. If Plaintiff's claim fails at any step of the process, the ALJ does not advance to the subsequent steps. *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995). At step one the ALJ found Plaintiff has not engaged in substantial gainful activity since September 7, 2004, the date Plaintiff filed her application. R. at 16.[4]

At step two the ALJ found Plaintiff has eight medically determinable impairments, specifically, (1) asthma, (2) diabetes mellitus, (3) hypertension, (4) degenerative disc disease, (5) obesity, (6) HIV, (7) borderline intellectual functioning, and (8) depression. *Id*.

In accordance with 20 C.F.R. § 416.920a, the ALJ followed a special technique to evaluate the severity of Plaintiff's depression and borderline intellectual functioning. The four broad functional areas (activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation) are known as the "paragraph B" criteria for most of the mental disorders listed in Appendix 1 including Listing 12.04 *Affective Disorders*, but are "paragraph D" criteria under Listing 12.05, *Mental retardation*. The ALJ determined Plaintiff has a "mild" restriction in activities of daily living, "moderate" difficulties in social functioning, "moderate" difficulties in concentration, persistence or pace and "no" episodes of decompensation. R. at 20. "Because the claimant's mental impairments do

---

[4] Plaintiff does not allege disability *beginning* on the date that she filed her application, but *beginning* on May 25, 2004. *See* R. at 65. The very first sentence of the ALJ's decision states, "On September 7, 2004, the claimant protectively filed an application for supplemental security income, alleging disability beginning May 25, 2004." R. at 14. However the ALJ finds at step 1, "[t]he claimant has not engaged in substantial gainful activity since September 7, 2004, the application date (20 CFR 416.920(b) and 416.971 *et seq*)." *Id.* at 16. Per *Social Security Ruling (SSR)* 83-20, Titles II and XVI: Onset of Disability, "[o]nset will be established *as of the date of filing provided the individual was disabled on that date.*" SSR 83-20, 1983 WL 31249 at *7 (1983) (emphasis added). Thus September 7, 2004 is indeed the date of onset.

3

not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, the 'paragraph B' criteria ('paragraph D' criteria of listing 12.05) are not satisfied." *Id*.

Per Listing 12.04, because the "paragraph B" criteria were not met, the ALJ considered the "paragraph C" criteria. He found no evidence Plaintiff satisfied those criteria. *Id.*

Having completed the special technique for evaluating Plaintiff's mental disorders, the ALJ resumed the sequential evaluation process. At step three the ALJ determined Plaintiff does not have an impairment or combination of impairments that meets or medically equals the criteria of any of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ specifically considered Listing 3.00 *et seq.* (respiratory disorders), 4.00 *et seq.* (cardiovascular disorders), 9.00 *et seq.* (endocrine system disorders), and 14.00 *et seq.* (immune system disorders). The ALJ found none of the precise criteria were met.

At the urging of claimant's representative, the ALJ considered Listing 1.04 (disorders of the spine) but found the medical records did not establish the requisite criteria. Regarding Plaintiff's mental impairments, in addition to the special technique applied at step two, the ALJ determined Plaintiff did not meet the "paragraph B" criteria of Listing 12.05 "because the claimant does not have a valid verbal, performance, or full scale IQ of 59 or less." R. at 21. Further, Plaintiff fails to meet the "paragraph C" criteria of Listing 12.05 "because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id.*

Next, the ALJ determined Plaintiff's residual functional capacity ("RFC"). The ALJ found Plaintiff "has the residual functional capacity to perform simple, routine, low stress, light work not performed at a production pace with a sit/stand option except that she should avoid pulmonary irritants." *Id.*

At step four the ALJ noted Plaintiff's past relevant work as a crab processing worker, which the VE testified is light and unskilled. "The claimant's past relevant work exceeds the claimant's residual

4

functional capacity because it was performed at a production pace." *Id.* Hence the ALJ determined Plaintiff is unable to perform any past relevant work. *Id.* at 26.

Finally, at step five, the ALJ considered Plaintiff's age (38 years old; a younger individual), education (high school education), past work experience (transferability of job skills is not a factor because her past relevant work is unskilled) and her RFC. The ALJ determined Plaintiff lacked the RFC to perform the full range of light work. In the hypothetical question posed to the VE, the ALJ noted those limitations which would impede performance at the full range of light work. The ALJ found the Social Security Administration met its burden of proving that Plaintiff is capable of performing various other jobs[5] at the unskilled light occupational base that exist in significant numbers in the national economy, relying on the testimony of the VE. R. at 27, 742-43. Accordingly, the ALJ concluded Plaintiff is not disabled within the meaning of the Act. R. at 28.

3. **Standard of Review**.

The role of this Court on review is to determine whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the correct legal standards. 42 U.S.C. § 405(g); *Pass v. Chater*, 65 F.3d at 1202; *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). It is more than a scintilla, but less than a preponderance, of the evidence presented, *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (citations omitted), and it must be sufficient to justify a refusal to direct a verdict if the case were before a jury. *Hays*, 907 F.2d at 1456. This Court cannot try the case *de novo* or resolve evidentiary conflicts, but rather must affirm a decision supported by substantial evidence. *Id*.

---

[5] An inspector, a packer and a dispatcher.

4. **Discussion**.

*Obesity*

During the May 22, 2007 hearing the following exchanges occurred, primarily between Plaintiff and her attorney.

> Q: And what about before your operation in February of 2004 when you had that what was your, how were you doing before that operation?
>
> A: Oh, I had a good day then.
>
> Q: And what do you mean?
>
> A: I could go shopping and drive wherever I wanted to, and just basically do anything I wanted to do.
>
> Q: Okay. Now you had asthma back then, right?
>
> A: Uh-huh.
>
> Q: But it didn't interfere with – –
>
> A: Well, it wasn't like it is now.
>
> Q: Okay.
>
> A: Not since the weight gain.
>
> Q: Okay. Now when did the weight gain come because we haven't really established that yet?
>
> A: The weight gain started, I started, as a matter of fact my back started, and the first time I went to the hospital for my back was September the 1st, 2003. And in September and October, and I guess around November, no, in October of 2003 is when they started with the steroids for my back, and right off the bat that is when the weight started.
>
> Q: So you started gaining in October of '03?
>
> A: Right then. Yeah.

Q: Before your surgery?

A: Before my surgery.

Q: And did that cause any problems when you did have your surgery?

A: Oh, yes.

Q: That you were heavy?

A: I was, see it was supposed to have been a one day surgery, and then I, but being that I was so heavy after the steroids, the surgery took much longer plus I had to stay in the hospital for two weeks.

Q: Okay. And that was when you went from a pre-back problem weight of 146?

A: Right.

Q: And you got how heavy from that?

A: To 323.

Q: Okay. And has your weight stayed pretty much the same since then?

A: Yes.

\*     \*     \*

Q: Now how about your asthma after you gained weight did that get worse?

A: It got extra worse.

Q: Like in what, and describe the difference?

7

> A: I was going to the hospital two or three times a week, and I was staying in the hospital five to six days at a time. I was in the hospital at least twice a month every month.[6]
>
> ALJ: And after your surgery?
>
> CLMT: After I had gained all the weight.
>
> ALJ: Oh, after you gained all the weight. Okay.

R. at 725-26, 726-27.

In the decision the ALJ discusses factually Plaintiff's "obesity" on three occasions. (1) "The claimant testified that she started taking steroids prior to undergoing back surgery in 2003. Her weight gain started before the surgery." R. at 22. (2) "The claimant testified that her asthma worsened after the weight gain explaining that she was going to the hospital frequently for asthma exacerbations." *Id.* at 23. (3) After the May 22, 2007 hearing, Plaintiff had a consultative examination on June 27, 2007. "The claimant explained that she gained significant weight, from 146 to 301 pounds due to steroid use." *Id.* at 25.

The ALJ **never** identifies Plaintiff's *height* in the decision. Nor does the ALJ ever discuss Plaintiff's body mass index or BMI.

Obesity has been deleted as a listing from the Listing of Impairments. However the Social Security Administration "made some changes to the listings to ensure that obesity is still addressed in our listings. In the final rule, we added paragraphs to the prefaces of the musculoskeletal, respiratory, and cardiovascular body system listings that provide guidance

---

[6] Plaintiff has not presented medical records corroborating her testimony about the frequency of her visits to the hospital due to her asthma.

8

about the potential effects obesity has in causing or contributing to impairments in those body systems." *Social Security Ruling (SSR)* 02-01p,[7] 2000 WL 628049 at *1 (Sept. 12, 2002).

In the decision the ALJ evaluates Plaintiff's obesity, one of her *eight* severe impairments, as follows

> The claimant has been diagnosed with obesity. SSR 02-1p recognizes that obesity is a medically determinable impairment and that it effects must be considered when evaluating disability claims, since the effects of obesity in combination with other impairments can be greater than the effects of each impairment considered separately. Thus, any additional and cumulative effects of the claimant's obesity have been considered in assessing the claimant's impairments under each step of the sequential evaluation process.

The Court has thoroughly reviewed the record. Plaintiff's weight is not recorded every time she sought medical attention but her weight is recorded on multiple occasions. The Court has compiled a list of those weigh-ins, identifying the source and the page of the record. During the post-hearing consultative examination by Callum R. W. Bain, M.D. on June 27, 2007, Dr. Bain determined Plaintiff is five feet, four inches tall. R. at 617. The following day, June 28, 2007, Shore Health System identifies Plaintiff's height as 64 inches. R. at 591-92. However during her multiple visits at Choptank Community Health System, Inc. ("Choptank"), Plaintiff's height is listed as five feet, five inches tall or sixty-five (65) inches. *See* R. at 513, 515, 519, 521, 523, 525. Since there is disagreement whether Plaintiff is five feet, four inches tall (64 inches) or five feet, five inches tall (65 inches), the Court has created columns using both heights.

The Court calculates Plaintiff's BMI for all dates listed utilizing the *National Institute of Health's* (NIH) BMI Calculator located at http://www.nhlbisupport.com/bmi/.

---

[7] Titles II and XVI: Evaluation of Obesity.

| Source | Record Page | Date | Weight | BMI 64 inches | BMI 65 inches |
|---|---|---|---|---|---|
| Choptank | 523 | Sept. 13, 04 | 281 lbs | 48.2 | 46.8 |
| Choptank | 519 | Oct. 14, 04 | 271 lbs | 46.5 | 45.1 |
| John Hopkins | 480 | Oct. 25, 04 | 275 lbs | 47.2 | 45.8 |
| Choptank | 521 | Dec. 3, 04 | 263 lbs | 45.1 | 43.8 |
| Choptank | 515 | Dec. 17, 04 | 270 lbs | 46.3 | 44.9 |
| John Hopkins | 476 | Feb. 7, 05 | 275 lbs | 47.2 | 45.8 |
| Choptank | 513 | Mar. 17, 05 | 271 lbs | 46.5 | 45.1 |
| Dorchester | 482 | Apr. 19, 05 | 283 lbs | 48.6 | 47.1 |
| Dr. Shariff | 651 | May 11, 05 | 284 lbs | 48.7 | 47.3 |
| Choptank | 513 | May 12, 05 | 280 lbs | 48.1 | 46.6 |
| Choptank | 632 | Jun. 24, 05 | 275 lbs | 47.2 | 45.8 |
| Choptank | 632 | Sept. 27, 05 | 290 lbs | 49.8 | 48.3 |
| Choptank | 630 | Dec. 20, 05 | 292 lbs | 50.1 | 48.6 |
| Hearing | 726 | May 22, 07 | 323 lbs | 55.4 | 53.7 |
| Dr. Bain | 617 | Jun. 27, 07 | 301 lbs | 51.7 | 50.1 |
| Shore Health | 591 | Jun. 28, 07 | 301 lbs | 51.7 | 50.1 |

The Social Security Administration recognizes three levels of obesity in adults: (a) Level I are individuals with a BMI of 30.0 – 34.9, (b) Level II are individuals with a BMI of 35.0 – 39.9, and (c) Level III, "extreme" obesity, are individuals with a BMI equal to or greater than 40.0. *See SSR 02-01p*, 2000 WL 628049 at *2. The above table clearly demonstrates, that since the date of her September 7, 2004 SSI application, Plaintiff's BMI is greater than 40.0.

The three levels of obesity do not correspond with a specific degree of functional loss.

> There is no specific level of weight or BMI that equates with a "severe" or a "not severe" impairment. Neither do descriptive terms for levels of obesity (e.g., "severe," "extreme," or "morbid" obesity) establish whether obesity is or is not a "severe" impairment for disability program purposes. Rather, we will do an *individualized assessment of the impact of the obesity on an individual's functioning when deciding whether the impairment is severe*.

*SSR 02-01p*, 2000 WL 628049 at*4 (emphasis added).  If the ALJ conducted such an *individualized assessment of the impact of obesity* in determining the severity of Plaintiff's seven other impairments, it is not apparent from the record.

For example, the ALJ at step three determined Plaintiff's borderline intellectual functioning did not meet Listing 12.05C.  In the decision the ALJ discussed how the listing was not met because none of Plaintiff's IQ scores fall below 70.  R. at 21.  The ALJ failed to note that Plaintiff did satisfy part two of the requirement of Listing 12.05C, "a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]"  *Social Security Ruling 02-01p* specifically states "when evaluating impairments under mental disorder listing[] 12.05C . . . obesity that is 'severe' . . . *satisfies* the criteria in listing 12.05C for a physical impairment imposing an additional and significant work-related limitation of function. . . ."  *SSR 02-01p*, 2000 WL 628049 at*5 (emphasis added).  The Court acknowledges that Listing 12.05C requires a claimant to demonstrate a valid verbal, performance or full scale IQ between 60 and 70 <u>and</u> a physical or other mental impairment imposing an additional and significant work-related limitation of function.  Because the ALJ did not even make a passing reference to Plaintiff's obesity satisfying a portion of Listing 12.05C, it is not clear whether the ALJ, *in fact*, considered the potential effects of Plaintiff's obesity.

The ALJ determined degenerative disc disease is one of Plaintiff's eight medically severe impairments.  Listing 1.00 Q (2007), *Effects of obesity*, states

> Obesity is a medically determinable impairment that is often associated with disturbance of the musculoskeletal system, and disturbance of this system can be a major cause of disability in individuals with obesity.  The combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately.  Therefore, when

11

> determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity.

It is not apparent from the ALJ's decision that the effects of obesity were, in fact, so considered in light of Plaintiff's musculoskeletal impairment. The Social Security Regulations contain similar language concerning the effects of obesity on the respiratory system, *i.e.*, Plaintiff's asthma (Listing 3.00I) and the cardiovascular system, *i.e.*, Plaintiff's hypertension (Listing 4.00I.1). Similar to Plaintiff's musculoskeletal impairment, it is not apparent from the ALJ's decision that the effects of obesity were, in fact, considered in light of Plaintiff's asthma and hypertension.

Plaintiff did not suffer merely from obesity and one other severe impairment. Plaintiff suffered from *seven other severe impairments* in addition to obesity. According to *Social Security Ruling 02-01p*

> We will also find equivalence if an individual has multiple impairments, including obesity, no one of which meets or equals the requirements of a listing, but the combination of impairments is equivalent in severity to a listed impairment. For example, obesity affects the cardiovascular and respiratory systems because of the increased workload the additional body mass places on these systems. Obesity makes it harder for the chest and lungs to expand. This means that the respiratory system must work harder to provide needed oxygen. This in turn makes the heart work harder to pump blood to carry oxygen to the body. Because the body is working harder at rest, its ability to perform additional work is less than would otherwise be expected. Thus, we may find that the combination of a pulmonary or cardiovascular impairment and obesity has signs, symptoms, and laboratory findings that are of equal medical significance to one of the respiratory or cardiovascular listings.

> However, we will not make assumptions about the severity or functional effects of obesity combined with other impairments. Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment. We will evaluate each case based on the information in the case record.

*SSR 02-01p*, 2000 WL 628049 at *5-6. Any evaluation of the combination of impairments and the severity or functional effects of obesity are absent from the ALJ's decision.

With regard to Plaintiff's asthma, as documented in the administrative record, since September 7, 2004 (the date of Plaintiff's SSI application), (1) Plaintiff presented herself to the emergency room, was admitted to the hospital of Shore Health System of Medicine on November 28, 2004 and discharged on December 1, 2004 with an admitting diagnosis of asthma exacerbation, *see* R. at 394-97; (2) Plaintiff was admitted to the hospital of Shore Health System of Medicine on March 6, 2005 and discharged on March 8, 2005 as a result of asthma exacerbation, *see* R. at 422-24, 728; and (3) Plaintiff presented herself to the emergency room of Shore Health System of Medicine at 5:39 a.m. on August 13, 2005 with asthma – acute exacerbation. R. at 676, 680. She was discharged approximately two hours later at 7:30 a.m. R. at 683.

In the decision the ALJ notes Plaintiff's multiple instances of non-compliance with medical treatment. R. at 23. For instance, on December 17, 2005, shortly after Plaintiff was released from the hospital, Dr. Esther Elliott recorded that Plaintiff "was not taking her Advair[8] as directed resulting in uncontrolled asthma." R. at 18. During that same session however Dr. Elliot recorded that she "[e]xplained that cough medicine is not for asthma, was just for the

---
[8] Advair is medication prescribed for the long term, twice daily maintenance treatment of asthma. *Physicians' Desk Reference* 1276, 1292 (64th ed. 2010).

13

cold/infection that triggered her last attack/hospitalization – she needs to use her chronic asthma meds for her night-time cough (which is a sign her asthma isn't controlled)." R. at 520.

Also in the decision the ALJ noted that on December 20, 2005 Dr. Elliot recorded that Plaintiff's asthma was under control, that Plaintiff was using nebulizer treatments three times per week, but that Plaintiff was not using her Advair regularly. R. at 18; *see* R. at 635. The decision may leave an impression that Plaintiff had no further problems with her asthma, but the record demonstrates otherwise. On May 8, 2006 Plaintiff left a message for Dr. Elliott claiming that her asthma has been bad for four (4) days. R. at 634. When Dr. Elliott examined Plaintiff on May 17, 2006 Dr. Elliott recorded, under assessment, that Plaintiff has asthma with bronchial exacerbation. R. at 631. This condition persists despite Plaintiff using a nebulizer machine three (3) times a week. R. at 630. As of the June 27, 2007 consultative examination by Dr. Bain, Plaintiff is taking sixteen (16) medications.[9] R. at 616-17. Advair is not among those medications.

Listing 3.03B (2007), Asthma Attacks, states

> Attacks (as defined in 3.00C), in spite of prescribed treatment and requiring physician intervention, occurring at least once every 2 months or a least six times a year. Each in-patient hospitalization for longer than 24 hours for control of asthma counts as two attacks, and an evaluation period of at least 12 consecutive months must be used to determine the frequency of attacks.

---

[9] "Albuterol nebulizer every 4 hours, a handheld nebulizer when she travels. Furosemide 20 mg every morning, Lexapro 10 mg every morning, Singulair 10 mg at bedtime, diltiazem 360 mg every morning, clonazepam 0.5 at bedtime, ranitidine 300 mg every morning . . . metoclopramide 10 mg at bedtime, Ditropan two 5 mg tablets daily, Crestor 10 mg every morning, hydrochlorothiazide 25 every morning, fentanyl patch 25 mcg every third day, Xalatan eye drops in the right eye at bedtime, metformin 500 mg twice daily . . . Percocet every 4-6 hours, loratadine 10 mg every morning." R. at 616-17. Dr. Bain also noted Plaintiff takes vitamin D, 50,000 units, every other week and uses a nasal steroid spray.

From the period of November 28, 2004 to November 27, 2005 Plaintiff was hospitalized for more than 24 hours from November 28 – December 1, 2004 <u>and</u> March 6 – 8, 2005, qualifying as a total of four (4) attacks. On August 13, 2005 Plaintiff reported to the emergency room for physical intervention, qualifying as a fifth attack.

The ALJ recognized these instances of asthma attacks in the decision.

> Between November 28, 2004 and December 1, 2004, the claimant was hospitalized secondary to an asthma exacerbation which occurred following an upper respiratory infection (Exhibit 17F). The claimant's regular inhalers were not helping relieve her chest tightness. While in the hospital, the claimant was seen by physical therapy, who noted she exhibited no complaints of pain, she was independent with her activities of daily living and her mobility. A nebulizer was delivered to the claimant on March 8, 2005 (Exhibit 19F). On June 28, 2007, the claimant underwent a spirometry examination performed by Gregg Oliver, M.D., which revealed a mild obstructive ventilatory defect, which is bronchospastic in nature. The claimant again experienced an asthma exacerbation on August 13, 2005 when she presented at the emergency room (Exhibit 38F).

R. at 17.

The ALJ found that the precise criteria of Listing 3.00 have not been met. R. at 19. "Moreover, no physician has mentioned any findings equivalent in severity to any listed impairment, nor are such findings indicated or suggested by the evidence of record." *Id.*

Besides the five "qualifying" asthma attacks, Plaintiff testified during the hearing that her asthma has become worse with her weight gain. "The combined effects of obesity with respiratory impairments can be greater than the effects of each of the impairments considered separately. Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process . . . adjudicators must consider any additional and cumulative

effects of obesity." Listing 3.00I (2007). It is not apparent to the Court that the ALJ, in fact, considered the cumulative effects of obesity when assessing Plaintiff's severe impairment of asthma. With five "qualifying" asthma attacks in a one year period (November 28, 2004 to November 27, 2005) *combined with* the cumulative effects of obesity, the ALJ never appears to consider a possible closed period of disability.

*Social Security Ruling 02-01p* establishes a guideline for adjudicators evaluating obesity. The ALJ's decision in this case does not appear to conform to that Ruling. The Court directs the parties to *Peters v. Commissioner of Social Security Administration*, No. 1:08CV203, 2010 WL 1369245, at *11-12 (N.D.W. Va. Mar. 31, 2010) for an ALJ decision where it is clearly apparent that the ALJ considered a claimant's obesity and any possible effects of that obesity on the claimant's pulmonary and respiratory conditions. *Contra Gross v. Astrue*, No. JKB-09-1456, 2010 WL 1328462, at *5 (D. Md. Mar. 26, 2010) ("Although it is possible that the ALJ did consider <u>obesity</u>, the absence of discussion in his ruling prevents the Court from knowing whether the ALJ followed the directions set forth in Social Security Ruling 02-1p.").

5. **Conclusion**.

Substantial evidence does not support the decision that Plaintiff is not disabled. Accordingly, the Plaintiff's Alternative Motion for Remand will be granted and Defendant's Motion for Summary Judgment will be denied.


Date: <u>November 24, 2010</u>　　　　　　　_____/s/_____
　　　　　　　　　　　　　　　　　　　　　WILLIAM CONNELLY
　　　　　　　　　　　　　　　　　　UNITED STATES MAGISTRATE JUDGE